UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

TAPP MARKET INFLUENCERS, LLC, THE BLU
MARKET INC. and STEVEN FORKOSH

              Plaintiffs,

      -against-

ESPIRE ADS, LLC, KVRMA, LLC, LISA NAVARRO,
NATHANIEL CO, CHARLES PUNAY, CPA VIRAL LLC,
D/B/A TAPMOB AND JASPER PANGILINAN

              Defendants

------------------------------------------------------------------------x

TRIAL BY JURY DEMANDED

Case No.1:21-cv-11068-JGK

FIRST AMENDED
COMPLAINT

Plaintiffs, by their attorneys, Richard L. Herzfeld, P.C., for their first amended complaint, allege as follows:

PARTIES

1.    Plaintiff, TAPP MARKET INFLUENCERS, LLC ("TAPP"), is a limited liability company formed under the laws of the State of New York.

2.    Plaintiff, THE BLU MARKET INC. ("Blu Market") is, and at all times hereinafter mentioned was, a corporation formed under the laws of the State of New York.

3.    Plaintiff, STEVEN FORKOSH ("Forkosh") is, and at all times hereinafter mentioned was, an individual residing within the City and State of New York.

4.    Upon information and belief, defendant ESPIRE ADS, LLC, is, a limited liability company formed under the laws of the State of Delaware.

5.    Upon information and belief, defendant KVRMA, LLC ("Kvrma") is a limited

1

liability company formed under the laws of the State of California.

6.      Upon information and belief, defendant LISA NAVARRO ("Navarro"), is an individual residing within the State of California.

7.      Upon information and belief, defendant NATHANIEL CO ("Co"), is an individual residing within the State of California.

8.      Upon information and belief, defendant JASPER PANGILINAN ("Pangilinan"), is an individual residing within the State of California.

9.      Upon information and belief, defendant CHARLES PUNAY , is an individual residing within the State of California.

10.      Upon information and belief, defendant CPA VIRAL LLC, , is a limited liability company formed under the laws of the State of California, also doing business as TAPMOB.

BASIS FOR JURISDICTION

11.      This Court has jurisdiction by reason of 28 USC §1332, diversity of citizenship.

12.      Plaintiffs are citizens of the State of New York.

13.      Defendants are citizens of the State of California and Delaware.

14.      Jurisdiction is also pursuant to 18 U.S.C. §1336(c) for claims under the "Defend Trade Secrets Act" and over plaintiffs' state claims pursuant to 28 U.S.C. §1367(a).

15.      Venue is properly in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391(b)(2) and (3), as the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and

alternatively, as the judicial district in which defendants are subject to the court's personal jurisdiction.

## INTRODUCTION

16.    Social media influencing is the process of increasing public awareness and demand for various products through the social media sites of "affiliates" or "influencers", persons on social media with large followings, to promote the products by bringing them to the attention of their followers, people who follow the influencers on social media such as Instagram, Twitter, etc.

17.    Forkosh has been involved in the business of social media influencing for over 8 years.

18.    He began in 2013 when he formed The Blu Market Inc., a New York corporation which was engaged in social media influencer advertising and apps.

19.    More recently, he and others formed TAPP to engage in these areas as well as other aspects of the advertising business.

20.    Companies such as Blu Market are intermediaries. They are engaged by an advertiser for a particular product through social media influencing and then  engage "affiliates" or "influencers" to promote the products by bringing them to the attention of their followers.

21.    These influencers are independent contractors, and always are engaged on a non-exclusive basis.

22.    The project is set up using third party companies such as Tune, which provides its proprietary tracking platform to track the project and the influencers in order to calculate compensation. It tracks the project, records which influencer should be credited

and provides periodic reports from which invoices can be generated.

23.    Espire was formed by Navarro in or about 2015 while she was employed by Blu Market.

24.    It is engaged in the same business as plaintiffs and is a competitor.

25.    Co, and Punay had worked for Blu Market along with Navarro and then worked for Espire.

26.    Co and Punay then formed and operated CPA VIRAL LLC d/b/a Tapmob, also a competitor of plaintiffs.

27.    Co and Pangilinan had worked for Blu Market before being caught engaging in acts of fraud and self-dealing which resulted in their execution of a settlement agreement imposing restrictions on their future actions.

28.    In 2019, Navarro formed Kvrma.

29.    Navarro holds Kvrma out as a 501(c)(3) registered charitable organization (Exhibit 1).

30. Kvrma is engaged in the same for profit social media advertising as Espire and Tapmob.

31. Tapmob and Kvrma have virtually identical website formats and content, soliciting social media advertisers and influencers (Exhibit 2).

32. Tapmob designed Kvrma's website formats and content.

33. Kvrma also designs and sells clothing lines.

34. Kvrma is not registered as a 501(c)(3) charitable organization with the Internal Revenue Service (Exhibit 3).

35.    It is not. a 501(c)(3) registered charitable organization.

4

36.    Kvrma and Espire are owned in whole or in part by Navarro and under Navarro's control.

37.    Navarro has transferred assets from Espire to Kvrma to avoid creditor liabilities, including the liabilities in this action.

38.    Navarro and Espire have sued some of the plaintiffs herein for  purportedly stealing Espire intellectual property (Espire Ads, LLC et al v. TAPP Influencers Corp. et al, 1:21-cv-10623 (JGK) ).

39.    Navarro has admitted that the intellectual property originated with Blu Market.

40.    Navarro has claimed in her defamatory broadcast that it was Kvrma, formed in 2019, which purchased Blu Market's intellectual property for $50,000, not Espire.

## DEFENDANTS AS A FAITHLESS EMPLOYEES

41.    Navarro began with Blu Market as an employee sometime in 2013 or 2014.

42.    She gradually gained Forkosh's trust and was appointed to the position Chief Operations Officer, which gave her unsupervised access to all of Blu Market's operations.

43.    In accepting her employment, Navarro understood that she would have access to confidential and proprietary information that belonged Blu Market.

44.    She had access to Blu Market's confidential business development plans to attract customers.

45.    She had access to its confidential marketing plans.

46.    She was privy and had access to Blu Market's business plans, business development, the formatting, third party layering and networking tools for Blu Market technology, internal logistical and operational procedures , business relations, business plans, financial information, contract templates and software wherewithal.

5

47.     She interfaced with its clients and the influencers it employed and had access to confidential information concerning each.

48.     She had access to its banking and credit cards and sole responsibility to approve invoices and make payments to employees, influencers and vendors, all without oversight.

49.     Plaintiffs' advertiser list and list of affiliates, its marketing and business plans, its customer specific business models, its internal logistical and operational procedures business plans, business development, the formatting, third party layering and networking tools for Blu Market technology, its financial information, contract templates and software wherewithal qualify as trade secrets as a formula, pattern, device or compilation of information which is used in Blu Market's business which gives Blu Market the opportunity to obtain an advantage over competitors who do not know or use it.

50.     Plaintiffs take great care and precaution to preserve the exclusivity of its trade secrets and this information is not otherwise known outside of the business.

51.     Plaintiffs only divulge trade secrets of the kind described herein if there is a commitment by the recipient to maintain its confidentiality which Navarro made in this case.

52.     A confidential relationship existed between Navarro and Blu Market.

53.     Navarro capitalized on the information learned by reason of her confidential relationship with Blu Market.

54.     Navarro violated the trust of Blu Market extended by reason of that confidential relationship.

55.     Although Navarro continued with Blu Market until 2017, it turned out that she was a faithless employee for much of her employment in violation of her confidentiality

6

commitment as well as her statutory and common law obligations to Blu Market.

56.     In May, 2015, she secretly founded and began operating Espire, while working for Blu Market (Exhibit 4). She continued into mid-2017, illegally stealing hundreds of thousands of dollars from Blu Market for her startup.

57.     As a trusted executive officer, Navarro acted without any oversight, allowing her free reign to brazenly strip Blu Market of customers, business opportunities, business models, internal logistical and operational procedures , the formatting, third party layering and networking tools for Blu Market technology, its financial information, contract templates, software wherewithal, confidential personal information for its customers and influencers, its employees and its funds.

58.     She subverted other Blu Market employees (Justin Emert, Eric Radke, Nick Dimartino and Alex Vazquez) who joined in her plan and she then used these employees to steal trade secrets including confidential business plans, marketing plans, customer information, influencer information and Tune files with operations information.

59.     These trade secrets included price structures to clients and payment structures to affiliates.

60.     It also gave Navarro and Espire the ability to communicate directly with Blu Market's advertisers and influencers and to replicate the systems and infrastructure Blu Market had painstakingly created.

61.     She had her cohorts export a list of about 12,000 Blu Market influencer contacts (Exhibit 5).

62.     Navarro stole Blu Market's "pitch deck", the Blu Market business plan developed to attract clients.

63.     Navarro stole Blu Market's formatting, third party layering and networking tools for Blu Market technology

64.     Navarro copied Blu Market contracts verbatim.

65.     Navarro filed copyrights for desktop and mobile apps for Espire (one of which she claims was created at the same time she left Blu Market (Exhibit 6).  Upon information and belief, Navarro's copyrights were based upon code and applications which she also took from Blu Market.

66.     Navarro used her Blu Market email to create a Linked In account for Espire.

67.     Navarro operated Espire in secret and converted all of the foregoing Blu Market property to prepare for the time when she would come out into the light as Espire's head of operations.

68.     In July, 2017, Navarro decided it was time.

69.     First, she and her "team" reached out to Blu Market clients to advise them of the coming "transition", while Navarro was still embedded at Blu Market (Exhibit 7).

70.     Then, she stripped Blu Market of working capital.

71.     Navarro had unfettered, unsupervised access to Blu Market funds

72.     As the person in charge of payments, Navarro was aware that as a result of the damage Navarro had already caused surreptitiously, Blu Market had extraordinary credit card debt on Steven Forkosh's credit cards.

73.     When Navarro was ready reveal her role in Espire, Navarro used Blu Market funds to promote her interests and those of Espire at Blu Market's expense.

74.     She admits taking most of the funds which were available and forwarding the funds to Blu Market influencers she hoped to use at Espire,  promoting her self-interest

75.     Navarro used her unsupervised access to authorize a Paypal disbursement to herself for $5,000 (Exhibit 8), attaching her own note that this was for 1/3 of salary owed.

76.     There was no salary owed and Espire and Navarro then used the stolen information and funds to engage in a competing social influencer advertising business in violation of Navarro's common law and contractual duties.

77.     As a result, when Navarro left, Blu Market was left without funds to operate, debt to pay and disgruntled employees.

78.     At the same time as Navarro was stealing Blu Market property, Navarro repeatedly evidenced her contempt of Forkosh, bragging that Blu Market was financing the creation of its own competitor, Espire, right under Forkosh's nose.

79.     Navarro constantly assured her cohorts that there would be no repercussions from Forkosh against them as she had been accumulating embarrassing videos and photographs of Forkosh which she would publically disclose to his clients, family and friends if he took any action against them.

80.     After stealing whatever she could from Blu Market, one Monday in 2017, Navarro left without notice, taking Justin Emert, Erik Radke, Jon Melendez and Nick Dimartino, who were Blu Market employees. Forkosh came in that Monday to an empty office with no clue as to what had taken place.

81.     When she left, Navarro and Melendez (her boyfriend) not only went into Blu Market offices and stole physical records, she actually stole American Express gift cards used in the business, and left a note behind in the envelope which held the cards for Forkosh to find stating, "looking for something?".

82.     After Navarro left, Navarro and her boyfriend acted on Navarro's boasts that

there would be no repercussions. They threatened Forkosh that if he ever took any action against Navarro for her faithless actions or challenged Espire's use of Blu Market's information, they would engage in physical violence against his family and Navarro and Melendez would publicly defame him over social media using what she claimed were embarrassing photographs and videos which she had secretly taken just for this purpose.

### NAVARRO'S FIRST ATTEMPT TO EXTORT AN OWNERSHIP INTEREST IN FORKOSH'S BUSINESS

83.    Simply stealing Blu Market funds and trade secrets and threatening Forkosh, however, was not enough.

84.    In July/August, 2017, Navarro made the incredible assertion that she was actually a shareholder of The Blu Market Inc.

85.    In response, counsel for Blu Market rejected her claims, summarized  the thefts Navarro committed while at Blu Market and the actions which would be taken against her should she persist (Exhibit 9).

86.    Navarro's attempted extortion quicky ended.

THE JOINT EFFORTS OF ESPIRE, KVRMA, NAVARRO, CO AND PUNAY

87.    Punay worked with plaintiffs through 2020.

88.    A confidential relationship existed between Punay and plaintiffs and Punay committed to maintain the confidentiality of plaintiffs' trade secrets.

89.    Punay violated the trust of plaintiffs extended by reason of that confidential relationship.

90.    Punay capitalized on the information learned by reason of the confidential relationship with plaintiffs.

91.     While still working with Blu Market, Punay began work with Espire in December 2018.

92.     A confidential relationship existed between Punay and plaintiffs and Punay committed to maintain the confidentiality of plaintiffs' trade secrets.

93.     A confidential relationship existed between Punay and plaintiffs and Punay committed to maintain the confidentiality of plaintiffs' trade secrets.

94.     In or about June, 2021, Forkosh learned that Espire, Navarro and Punay had begun a campaign using plaintiffs' trade secrets and intellectual property and defaming plaintiffs with current and prospective advertiser clients and influencers.

95.     Under Co's guidance and direction, they directed fake traffic (VDOS) to the influencer links that would cause their sites to crash which they then used to try to convince the influencers to switch from plaintiffs to Espire.

96.     Then, they embarked on a campaign which asserted the exact opposite. Although they had engaged in misfeasance against plaintiffs, they advised current and prospective advertising clients and influencers that plaintiffs were scam artists and stole intellectual property.

97.     A cease and desist email was forwarded to Navarro and others in June, 2021.

98.     Undaunted, Navarro continued her defamatory campaign and again accused plaintiffs of the bad acts which she had committed in an action filed by Navarro and Espire in this Court, Espire Ads, LLC et al v. TAPP Influencers Corp. et al, 1:21-cv-10623 (JGK).

99.     That complaint was filed on December 14th at which time the court docket shows that plaintiffs' counsel was advised of the need to file a civil information cover sheet.

100.    However, nothing further took place for approximately two weeks.

101.    As such, during that period, plaintiffs, who are named as defendants therein, did not have the opportunity to defend themselves, counterclaim and/or seek dismissal and sanctions.

102.    The reason for that failure is now clear.

103.    Defendants' goal was not to adjudicate their alleged claims, it was a continuation of defendants' schemes to defame defendants and undermine their business relationships, without going through the trouble of proving anything.

104.    To that end, defendants Navarro and Co individually and through their companies, Espire, Kvrma and CPA Viral LLC, D/B/A TAPCO, have forwarded texts and made pronouncements on social media to influencers and advertisers with whom Blu Market had business relations and to the influencing community in general. One such text states,

> that TAPP will be facing 25+ Federal charges as if this were a criminal complaint;
>
> that simply by virtue of the complaint, TAPP cannot be trusted; and .
>
> that when TAPP is put out of business by this suit "you know where to go". Exhibit 10 hereto.

105.    In addition, Navarro, individually and in her representative capacity for Espire and Kvrma, has made public pronouncements on influencer frequented sites such as Instagram Live.

106.    In a broadcast on or about January 21, 2022, attended by an audience of over 2500 persons in the influencer community, Navarro invited listeners to google her lawsuit and proclaimed that the instant action would be dismissed.

107.    She admitted that she diverted all of Blu Markets funds and then"bounced".

108.    She asserted that Forkosh, Blu Market and Tapp were scam artists.

109.    In her broadcast, Navarro has admitted that the intellectual property which she claims in her suit had been copied or stolen by TAPP from Espire in fact originated with Blu Market.

110.    In an effort to fabricate a narrative which will explain how plaintiffs could have stolen that which they created, Navarro also asserted that Blu Market's intellectual property had been purchased (this time by Kvrma not Espire) from Blu Market for $50,000 and that it was then stolen back by plaintiffs.

111.    As Kvrma was not formed until 2019, Navarro's new narrative actually confirms that which is already documented, that Espire's access to Blu Market intellectual property since 2015 was the result of defendants' theft of that property.

112.    Defendants' texts and pronouncements were false, defamatory, malicious, and libelous.

113.    Defendants were motivated by actual malice in that they knew that the allegations concerning plaintiffs were false and untrue.

114.    Defendants' intentional acts were committed for the sole, malicious purpose of inflicting economic damages against plaintiffs.

115.    As a result of the publications and the acts of defendants in connection therewith, plaintiffs have been held up to public contempt, ridicule, disgrace, and prejudice, have been irreparably injured in their good names, business reputation, and social standing, have lost the esteem and respect of their friends, acquaintances, business associates, and of the public generally and have lost present and future business.

13

116.    Apart from Navarro's claim being blatantly false and defamatory, if there were a $50,000 acquisition (which there was not), those funds were converted by Navarro, Kvrma and Espire as they never found their way to Blu Market or Forkosh.

117.    Navarro's claims that it is Kvrma owned intellectual property also evidences Navarro's latest breach of her fiduciary obligations and fraudulent conveyance.

118.    Navarro has committed numerous violations of her responsibilities at Espire including misuse of funds.

119.    This misconduct has resulted in a litany of complaints by her fellow Espire owners (those who she did not wrongfully purge) and, upon information and belief, an FBI inquiry.

120.    Just as she diverted business and property from Blu Market to Espire, she is now diverting assets and business from Espire to Kvrma to cheat her Espire partners, to render Espire insolvent and to prevent plaintiffs from collecting any Espire award.

CO AND PANGILINAN'S BREACH OF THEIR PRIOR CONTRACT WITH PLAINTIFFS

121.    In 2014/2015, Co and Pangilinan had been involved in a joint venture relationship with Blu Market and Forkosh.

122.    Using that relationship, Co and Pangilinan engaged in an effort to steal Blu Market information.

123.    After litigation was commenced, the joint venture was terminated, intellectual property was assigned to Blu Market and each agreed not to contact any influencers or advertisers with which Blu Market did business during the course of the agreement.

124.    Co and Pangilinan have violated their settlement agreement with Forkosh and Blu Market (Exhibit 11).

125.   Co and Pangilinan have violated violated the settlement by developing Kvrma's website using the technology assigned by him to Blu Market.

126.   Co and Pangilinan have further violated the settlement by assisting Kvrma in using the site to attract influencers and advertisers with which Blu Market has had a relationship in violation of the parties' settlement agreement.

127.   Co has violated the agreement in disseminating the above defamatory texts to influencers and advertisers with which Blu Market has had a relationship and soliciting those influencers and advertisers.

### NAVARRO'S SECOND ATTEMPT TO STEAL AN INTEREST IN FORKOSH'S BUSINESS- THE "JOINT VENTURE"

128.   In July, 2020, Navarro and Forkosh engaged in discussions in which Navarro expressed interest in doing business together and agreed to destroy and/or deliver any compromising photos and videos she had.

129.   A proposed agreement was drafted but they could never come to terms.

130.   When negotiations stalled, Navarro presented an abbreviated interim agreement in order to move forward while final details were worked out. Exhibit 12.

131.   The document was forwarded to Forkosh directly, circumventing counsel.

132.   The document asserted that Navarro was the sole owner of Espire.

133.   That representation was untrue.

134.   Espire's operating agreement (Exhibit 13) shows several owners.

135.   As an interim agreement, it provided that the parties "shall" enter into a "50%/50% partnership" for the company. When completed, Forkosh would retain 50% of all three entities as would Navarro.

15

136.    It also provided for the creation of an operating agreement for the anticipated venture.

137.    None of the foregoing took place and agreement was never effectuated.

138.    No joint venture was created.

139.    No transfer of interests occurred.

140.    No operating agreement was drafted for the proposed joint venture.

141.    Although it provided for the payment of salaries, needless to say no payments were made.

142.    No entity was created and no tax return was filed.

143.    Moreover, based upon the Espire operating agreement, Navarro was not even authorized to commit to the transfer of her interest.

144.    As nothing moved forward, and after learning that Navarro did not even have the authority to enter into an agreement and her representations were fraudulent, the agreement was rescinded (although Navarro represented it was never signed at all) (Exhibit 14).

145.    Navarro has ignored the rescission and asserts in her complaint that by virtue of the "agreement",  she is entitled to a variety of remedies, including the right to one-half of Blu Market and the right to then force its dissolution as a result.

### LIABILITY OF ESPIRE, KVRMA AND NAVARRO

146.    Navarro has complete control and domination of Espire and Kvrma.

147.    During the course of her operation of Espire and Kvrma, Navarro has treated each as her personal piggy bank, using corporate funds for vacations, apartments, automobiles and other personal expenses.

148.    She has blurred the lines between the entities, claiming in her lawsuit that intellectual property was owned by Espire and in her defamatory broadcast that it had been purchased by Kvrma.

149.    Navarro's complete disregard of the corporate entities has allowed her to shift assets and potentially alter claims to suit her own purposes and to shield herself from liability for what was a theft, not an acquisition.

150.    By reason of the Navarro control and disregard of legal structure each of Espire, Kvrma and Navarro are liable for any damages assessed against them.

FIRST CAUSE OF ACTION

FAITHLESS EMPLOYEE

151.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 150 as if fully set forth herein.

152.    Navarro's acts described above constitute acts of a faithless employee.

153.    By reason of the foregoing, Navarro is liable to Blu Market for all compensation paid to her in an amount in excess of $500,000, the full amount to be determined at trial.

SECOND CAUSE OF ACTION

THEFT OF THE TRADE SECRETS, PROPRIETARY
INFORMATION AND FUNDS OF PLAINTIFFS

154.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 153 as if fully set forth herein.

155.    The conversion of Blu Market trade secrets, proprietary information and funds by Navarro, Punay, Co, Pangilinan, Kvrma and Espire has damaged plaintiffs in the loss

of funds, income, customers, influencers and business opportunities.

156.   Plaintiffs' proprietary and confidential information as previously described is information not generally known to the public and  constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

157.   Plaintiffs' trade secrets are used or intended for use in interstate and/or foreign commerce.

158.   Plaintiffs seek to protect the confidentiality of its trade secrets by securing confidentiality commitments from those with access to the information.

159. Defendants are utilizing plaintiffs' trade secrets in order to compete with plaintiffs.

160. As a result of the misappropriation of plaintiffs' trade secrets by defendants, plaintiffs have lost their competitive advantage as well as the loss of existing and prospective clients.

161. Due to the loss of the foregoing, plaintiffs have suffered significant monetary damages.

162.   By reason of the misappropriation of plaintiffs' trade secrets by defendants, plaintiffs have been damaged in the loss of revenues and good will from 2016 through 2020, an amount to be determined at trial but in no event less than fifty million dollars ($50,000,000.00)and seek punitive damages in an amount to be determined at trial.

THIRD CAUSE OF ACTION

WRONGFUL INTERFERENCE WITH THE CONTRACTUAL RELATIONS AND
PROSPECTIVE CONTRACTUAL RELATIONS OF PLAINTIFFS BY DEFENDANTS

163.   Plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 through 162 as if fully set forth herein.

164.    Plaintiffs have or had contractual relations with many of the advertisers and influencers which defendants have sought to divert and others were prospective customers for plaintiffs' services.

165.    Plaintiffs have or had contractual relations with many of the advertisers and influencers which defendants contacted in communicating the false and misleading communications about plaintiffs and others are prospective customers for plaintiffs' services.

166.    Defendants' conduct constitutes tortious interference with contract and prospective business relations, based upon defendants' intentional acts committed for the sole, malicious purpose of interfering with plaintiffs' relations with existing customers and potential customers in the social influencing  community.

167.    Plaintiffs have suffered and will suffer loss of present and future business and loss of credit and reputation, all to their damage.

168.    By reason of the foregoing plaintiffs have been damaged in the loss of revenues and good will from 2016 through 2020 in an amount to be determined at trial but in no event less than fifty million dollars ($50,000,000.00) and seek punitive damages in an amount to be determined at trial.

FOURTH CAUSE OF ACTION

UNJUST ENRICHMENT OF ESPIRE, KVRMA AND NAVARRO

169.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 as if fully set forth herein.

170.    As a result of the unlawful misappropriation of trade secrets and funds by

Espire, Kvrma and Navarro, and unjust enrichment as alleged above, Espire, Kvrma and Navarro, without authorization and without just compensation to plaintiffs, and have been unjustly enriched, and are in possession of money which in good conscience and justice belongs to plaintiffs.

171.    As a direct and proximate result of defendants' acts of misappropriation and unjust enrichment, plaintiffs have suffered damages in the form of profits defendants have earned from the foregoing misconduct which profits should be disgorged to plaintiffs and moneys which have been diverted or stolen by them.

172.    By reason of the foregoing plaintiffs have been damaged in the loss of revenues and good will from 2016 through 2020, an amount to be determined at trial but in no event less than fifty million dollars ($50,000,000.00) and seek punitive damages in an amount to be determined at trial.

FIFTH CAUSE OF ACTION

BREACH OF CONTRACT BY CO AND PANGILINAN

173.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 172 as if fully set forth herein.

174.    Pursuant to the settlement agreement entered into between Co and Pangilinan on the one hand, and Forkosh and Blu Market on the other, Co and Pangilinan agreed not to contact any influencer or advertiser engaged by Blu Market during the course of their relationship.

175.    In forwarding texts to advertisers and influencers with which Blu had a relationship, Co breached the agreement.

176.    By developing a website for Kvrma to reach out to advertisers and influencers

with which Blu had a relationship using Blu Market technology, Co and Pangilinan have breached the agreement.

177.   By reason of the foregoing, Forkosh and Blu Market have been damaged by Co and Pangilinan in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

## PRIMA FACIE TORT BY ALL DEFENDANTS

178.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 177 as if fully set forth herein.

179.   Defendants' conduct constitutes a prima facie tort against plaintiffs, based upon the intentional acts committed for the sole, malicious purpose of inflicting economic damages against plaintiffs without proper, legal justification, cause or authority, as a result of which plaintiffs have suffered damage to their reputations and their relations in the social influencing community.

180.   Plaintiffs has suffered and will suffer loss of present and future business and loss of credit and reputation, all to plaintiffs' damage.

181.   By reason of the foregoing plaintiffs have been damaged in the loss of revenues and good will from 2016 through 2020, an amount to be determined at trial but in no event less than fifty million dollars ($50,000,000.00) and seek punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

## DEFAMATION AGAINST ALL DEFENDANTS

182.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 181 as if fully set forth herein.

21

183.   The primary business of plaintiffs is providing social influencing campaigns for advertisers and employing influencers to do so.

184.   Even if there is no immediate relationship between a plaintiff and a particular influencer or advertiser, the community is closely connected and a defamatory text or communication to even a limited number of influencers and advertisers will spread exponentially.

185.   As part of their scheme, Navarro and Espire pretended to engage in discussions for a joint venture, in order to use those discussions to then allege false and defamatory claims against plaintiffs in their complaint.

186.   Defendants began the campaign to defame plaintiffs with their assertions to advertisers and influencers that plaintiffs were scam artists and stole intellectual property although defendants were actually the guilty parties.

187.   These allegations are untrue, false, and defamatory.

188.   Ignoring the demand to cease and desist, defendants doubled down on the defamation by filing the complaint in this Court, then delaying service.

189.   It is apparent that the purpose of filing the complaint was to further the vindictive campaign of defendants against plaintiffs.

190.   The allegations of the complaint are untrue, false, and defamatory.

191.   No privilege is available to defendants as the purpose of the complaint was to wrongfully publish these false accusations to the social influencing community, many of whom are customers of plaintiffs.

192.   Defendants continued the campaign with the defamatory text, the allegations of which to the community are untrue, false, and defamatory.

193.    Plaintiffs only learned of the text allegations from an influencer to whom the text had been sent.

194.    Defendants caused the text and reference to the lawsuit to be distributed to the social influencing community.

195.    The complaint itself is publically available to anyone who wishes to look.

196.    In fact, Navarro, in her individual capacity and as the representative of Kvrma and Espire, made sure that the complaint would be seen and that her defamatory accusations spread, inviting the influencer community to google the suit and again stating that plaintiffs were scam artists who also stole intellectual property.

197.    Navarro has further broadcast that Blu Market sold its intellectual property to Kvrma for $50,000 and then plaintiffs stole the property back.

198.    Defendants were motivated by actual malice in that they knew that the allegations concerning plaintiffs were false and untrue.

199.    Defendants' intentional acts were committed for the sole, malicious purpose of inflicting economic damages against plaintiffs.

200.    The matters published were libel per se.

201.    These accusations were published solely for the purpose of harming plaintiffs' reputation and business relations.

202.    As a result of the publications and the acts of defendants in connection therewith, plaintiffs have been held up to public contempt, ridicule, disgrace, and prejudice, have been irreparably injured in their good names, business reputation, and social standing, have lost the esteem and respect of their friends, acquaintances, business associates, and of the public generally and have lost present and future business.

203.    By reason of the foregoing plaintiffs seek compensatory and punitive damages in an amount to be determined at trial.

EIGHTH CAUSE OF ACTION

FRAUDULENT CONVEYANCE

204.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 203 as if fully set forth herein.

205.    The conveyance from Espire and Navarro to Kvrma was made without fair consideration.

206.    Espire has been stripped of its assets by Navarro and Kvrma.

207.    At the time of the transfer of intellectual property from Espire to Kvrma Espire was insolvent, or was rendered insolvent, by reason of the transfer.

Kvrma from Espire was made with the actual intent of the defendants to hinder, delay or defraud plaintiffs.

208.    By reason thereof, plaintiffs demand that the conveyance to Kvrma be set aside as fraudulent, title be restored to its preconveyance status, and that plaintiffs be paid all sums rightfully due as determined in this action.

209.    By reason of the foregoing, plaintiffs are entitled to reasonable attorneys fees in this action against the defendants as provided in Debt. & Cred. Law § 276-a.

NINTH CAUSE OF ACTION

PERMANENT INJUNCTION

210.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 209 as if fully set forth herein.

24

211.    Plaintiffs, by reason of defendants' misconduct, have suffered and will continue to suffer irreparable injury  to their business and reputation for which damages are an inadequate remedy.

212.    Plaintiffs have no adequate remedy at law for the damages to their business and reputation inflicted by defendants.

213.    By reason of the foregoing, defendants, their agents, employees, officers, directors and members should be permanently enjoined from using plaintiffs' trade secrets, all such information should be delivered to plaintiffs, Navarro and her agents should be compelled to deliver up to Forkosh any photographs, videos or other materials she has in her possession regarding Steven Forkosh and defendants, their agents, employees, officers, directors and members should be permanently enjoined from and from issuing further communications regarding plaintiffs and any litigation with respect to plaintiffs to influencers, advertisers or others involved in social media influencing.

WHEREFORE, plaintiffs demand judgment as follows:

On the First Cause of Action, an award against Navarro in favor of Blu Market of no less than $500,000, the full amount to be determined at trial,

On the Second Cause of Action, an award against defendants in favor of plaintiffs for the loss of revenues and good will from 2016 through 2020, in an amount to be determined at trial but in no event less than fifty million dollars ($50,000,000.00) and punitive damages in an amount to be determined at trial.

On the Third Cause of Action, an award against defendants in favor of plaintiffs for the loss of revenues and good will from 2016 through 2020, in an amount to be determined

at trial but in no event less than fifty million dollars ($50,000,000.00) and punitive damages in an amount to be determined at trial.

On the Fourth Cause of Action, an award against defendants in favor of plaintiffs for the loss of revenues and good will from 2016 through 2020, in an amount to be determined at trial but in no event less than fifty million dollars ($50,000,000.00) and punitive damages in an amount to be determined at trial.

On the Fifth Cause of Action, an award against defendant Co and Pangilinan in favor of plaintiffs Blu Market and Forkosh in an amount to be determined at trial;

On the Sixth Cause of Action, an award against defendants in favor of plaintiffs for the loss of revenues and good will from 2016 through 2020, in an amount to be determined at trial but in no event less than fifty million dollars ($50,000,000.00) and punitive damages in an amount to be determined at trial.

On the Seventh Cause of Action, an award against defendants in favor of plaintiffs for the damages from defamation in an amount to be determined at trial.

On the Eighth Cause of Action, that the conveyance to Kvrma be set aside as fraudulent, title be restored to its preconveyance status, and that plaintiffs be paid all sums rightfully due as determined in this action and attorneys fees.

On the Ninth Cause of Action, that defendants, their agents, employees, officers, directors and members be permanently enjoined from using plaintiffs' trade secrets; that all such information should be delivered to plaintiffs; that Navarro and her agents should be compelled to deliver up to Forkosh any photographs, videos or other materials she has in her possession regarding Steven Forkosh; and that defendants, their agents, employees, officers, directors and members should be permanently enjoined from and

26

from issuing further communications regarding plaintiffs and any litigation with respect to

plaintiffs to influencers, advertisers or others involved in social media influencing;

Together with interest, costs, attorneys fees and such other and further relief as the

court deems proper.

Dated:  New York, New York          RICHARD L. HERZFELD, P.C.
        February 28, 2022

*Richard L. Herzfeld*
_____
By: RICHARD L. HERZFELD
Attorneys for Plaintiffs
112 Madison Avenue
8th Floor
NY NY 10016
212-818-9019
Rherzfeld@herzfeldlaw.com
NY Bar no.1130004